# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

|  |  |
|---|---|
| **In re**<br><br>**JOHN SERGIO,**<br><br>　　　　　　　　　**Debtor**<br>────────────────<br>**DONALD R. LASSMAN, CHAPTER 7 TRUSTEE,**<br>　　　　　　　**Plaintiff**<br><br>**v.**<br><br>**JOHN SERGIO,**<br>**CONNIE SERGIO, and**<br>**SUSAN BURKE,**<br>　　　　　　　**Defendants** | **Chapter 7**<br>**Case No. 12-15702-FJB**<br><br><br><br>**Adversary Proceeding**<br>**No. 13-1077** |

## MEMORANDUM OF DECISION

### I.      Overview

By his amended complaint in this adversary proceeding, Donald Lassman (the "Trustee"), plaintiff and chapter 7 trustee in the bankruptcy case of the debtor and defendant John Sergio (the "Debtor"), seeks to avoid an alleged prepetition fraudulent transfer of the Debtor's interest in certain real property and seeks recovery or turnover of that property or the proceeds thereof.  After a trial, the Court now makes the following findings and rulings and, on the basis thereof, concludes that judgment shall enter for the defendants dismissing the Trustee's amended complaint with prejudice.

### II.      Procedural History

On July 2, 2012, the Debtor filed a petition for relief under chapter 7 of the Bankruptcy Code, commencing the present bankruptcy case.  On March 5, 2013, the Trustee timely filed a complaint commencing this adversary proceeding.  The original complaint named the Debtor and his former wife,

Connie Sergio ("Mrs. Sergio"), as defendants and sought avoidance of an alleged prepetition fraudulent transfer to Mrs. Sergio of the Debtor's interest in real property located on High Street in Bridgewater, Massachusetts (the "High Street Property").  The Trustee alleged in the original complaint that the Debtor voluntarily transferred his interest in the High Street Property to Mrs. Sergio for no consideration without receiving reasonably equivalent value in exchange for the transfer.  The Trustee further alleged that, subsequent to the alleged fraudulent transfer, Mrs. Sergio sold the High Street Property to unrelated buyers.  In addition to avoidance of the transfer to Mrs. Sergio, the original complaint sought recovery and turnover of a portion of the proceeds derived from Mrs. Sergio's sale of the High Street Property.

The Debtor timely filed an answer to the original complaint.  Mrs. Sergio did not timely file an answer.  Consequently, the Clerk entered a default against Mrs. Sergio.

A trial was scheduled for December 20, 2013.  Shortly before this first scheduled trial date, the parties filed a joint motion to continue the trial on the basis that during discovery, the Trustee had learned additional details concerning the existence of a subsequent transferee of the proceeds from the sale of the High Street Property.  The alleged subsequent transferee was Mrs. Sergio's daughter, Susan Burke ("Mrs. Burke").  The Court granted the continuance.  Subsequently, Mrs. Sergio moved to vacate her default, which motion the Court eventually allowed after the Trustee first filed and then withdrew an opposition.  In October 2014, the Trustee moved to amend his complaint, which motion the Court allowed.

The amended complaint names the Debtor, Mrs. Sergio, and Mrs. Burke as defendants.  In addition to the facts alleged in the original complaint, the amended complaint alleges that after selling the High Street Property, Mrs. Sergio transferred some or all of the sale proceeds to her daughter, Mrs. Burke.  The amended complaint states three counts.  Count I seeks avoidance and recovery of the alleged fraudulent transfer pursuant to 11 U.S.C. §§ 544 and 550 and MASS. GEN. LAWS ch. 109A, §

5(a)(2)(ii).  Count II seeks avoidance and recovery of the alleged fraudulent transfer pursuant to 11

U.S.C. §§ 544 and 550 and MASS. GEN. LAWS ch. 109A, § 6(a).  Count III seeks turnover of $31,456 of the

proceeds from the sale of the High Street Property plus interest pursuant to 11 U.S.C. § 542(a).

The Court held a one-day trial.   Prior to trial and again at trial, the Court asked the parties

whether they consented to the Court entering final judgment on all counts in this matter.  The Trustee

consented.  Notwithstanding prior written statements to the contrary, at trial all three defendants also

consented to the Court entering final judgment.  After the close of evidence, Mrs. Burke moved for a

directed verdict, which motion the Court denied, treating it as a motion for judgment on partial findings

under Fed. R. Civ. P. 52(c), as made applicable by Fed. R. Bankr. P. 7052.  After trial, the parties

submitted proposed findings of fact and conclusions of law.  The Court then took the matter under

advisement.

III.    **Findings of Fact**

1.  For several years during the 1980s, the Debtor owned and operated a restaurant in Halifax,

    Massachusetts under the name Monponsett Inn Restaurant.  During this time, the Debtor

    first met Mrs. Sergio who was a customer at his restaurant.  This restaurant closed

    sometime in the late 1980s.

2.  Beginning in or around 1990, the Debtor owned and operated a restaurant in Whitman,

    Massachusetts under the name Skip Sergio's, Inc.  Mrs. Sergio worked at Skip Sergio's, Inc.,

    but she was neither a corporate officer nor an owner.

3.  In 1996, the Debtor and Mrs. Sergio were married.

4.  On August 25, 1998, Mrs. Sergio purchased the High Street Property, from a third party, for

    approximately $178,000, acquiring title in her name alone.  To facilitate the purchase, Mrs.

    Sergio borrowed $142,400 and executed a first priority mortgage (the "First Mortgage") on

    the High Street Property securing said amount.  Mrs. Sergio also used funds she had

3

received from a previous divorce settlement toward the purchase. The Debtor did not provide any of the funds used to purchase the High Street Property. Nor did he incur any of the debt used to acquire the High Street Property. The Debtor and Mrs. Sergio lived together at the High Street Property.

5. Skip Sergio's, Inc. was ultimately unsuccessful and closed on or around October 12, 1998. At that time, the Debtor was individually liable for outstanding tax debts owed by Skip Sergio's, Inc. to both the Internal Revenue Service (the "IRS") and the Massachusetts Department of Revenue (the "MDOR"). Mrs. Sergio was not liable for the tax debts of Skip Sergio's, Inc.

6. The MDOR recorded the following tax liens at the Plymouth County Registry of Deeds against all of the Debtor's property for debts owed by the Debtor as the responsible person for Skip Sergio's, Inc.: a tax lien for $35,846.96 recorded on May 7, 1999 and a tax lien for $50,742.41 recorded on October 6, 1999.

7. In or around 1999, the Debtor purchased and began operating a restaurant in East Bridgewater, Massachusetts under the name Connie's, Inc. The Debor was the sole shareholder and manager of Connie's, Inc. Mrs. Sergio worked at Connie's, Inc. and was a corporate officer.

8. On February 23, 2000, Mrs. Sergio, who then held title to the High Street Property in her name alone, executed a deed conveying the High Street Property from herself alone to herself and the Debtor as tenants by the entirety for consideration of $1.00.

9. On March 15, 2001, Mrs. Sergio borrowed $51,981.00 and executed a second priority mortgage (the "Second Mortgage") against the High Street Property securing this amount. Approximately $11,000 of this loan was used to pay off a car loan in the Debtor's name. The balance was invested into the restaurant, Connie's, Inc.

4

10. Connie's, Inc. was also ultimately unsuccessful.  On or around December 31, 2002, the
Debtor closed down Connie's, Inc., and the restaurant property was foreclosed upon.  At
that time, the Debtor and Mrs. Sergio were both individually liable as well as jointly and
severally liable for outstanding tax debts owed by Connie's, Inc. to the IRS and the MDOR.

11. On October 3, 2002, the MDOR recorded a tax lien at the Plymouth County Registry of
Deeds for $11,365.48 against all of the Debtor's property and all of Mrs. Sergio's property
for outstanding personal income tax debt.

12. On September 23, 2004, the MDOR recorded a tax lien at the Plymouth County Registry of
Deeds for $57,615.60 against all of the Debtor's property for debts owed by the Debtor as a
responsible person for Connie's, Inc.

13. The MDOR also recorded the following tax liens at the Plymouth County Registry of Deeds
against all of Mrs. Sergio's property for debts owed by Mrs. Sergio as a responsible person
for Connie's, Inc.: a tax lien for $18,238.54 recorded on December 20, 2001, a tax lien for
$25,560.39 recorded on July 11, 2002, and a tax lien for $59,518.16 recorded on January 27,
2005.

14. In or around 2004, the Debtor and Mrs. Sergio had fallen behind on mortgage payments on
the High Street Property and were facing a potential foreclosure.  Mrs. Sergio solicited funds
from her family and cured the default, thereby averting the foreclosure.  The Debtor did not
contribute any funds toward curing the default.

15. On or around July 27, 2005, the IRS recorded a tax lien at the Plymouth County Registry of
Deeds for $13,285.09 against all of Mrs. Sergio's property for debts owed by Mrs. Sergio as a
responsible person for Connie's, Inc.  This tax lien was eventually released in 2011 as will be
discussed below.

5

16. In or around 2005, the Debtor suffered a series of health crises that left him unable to work. The Debtor has not worked since 2005.  At trial, the Debtor and Mrs. Sergio both credibly testified that after the Debtor stopped working, Mrs. Sergio paid for all expenses relating to the High Street Property, including mortgage payments, property taxes, maintenance, and upgrades.  I credit this testimony.

17. In or around 2009, due in part to the strain their financial difficulties had placed on their marriage, the Debtor and Mrs. Sergio decided to divorce.  At this time, the High Street Property was still encumbered by the First Mortgage, the Second Mortgage, and the above listed tax liens.  The Debtor and Mrs. Sergio hoped to negotiate a settlement with the IRS and the MDOR for their outstanding tax debts.  They also hoped to refinance the High Street Property in order to make any settlement payments negotiated with the taxing authorities. However, the Debtor's poor credit impaired the couple's ability to refinance.

18. On August 12, 2009, in contemplation of their impending divorce and as part of the couple's effort to settle and pay off their tax debts, the Debtor executed a deed transferring his interest in the High Street Property to Mrs. Sergio.  In exchange, Mrs. Sergio agreed to seek refinancing of the High Street Property and to use the proceeds from the refinance to pay off any negotiated settlement payments to the taxing authorities.  In doing so, Mrs. Sergio agreed to pay off tax debts owed by the Debtor, individually, and tax debts owed by the Debtor and Mrs. Sergio jointly and severally.

19. On or around November 13, 2009, the Debtor and Mrs. Sergio entered into a separation agreement in which the Debtor agreed to waive and release any claim of right, title, and interest in the High Street Property

20. As of July 19, 2010, the Debtor and Mrs. Sergio were jointly and severally liable to the MDOR for $94,888.11 in tax debt arising out of their operation of Connie's, Inc.  As of July 19, 2010,

the Debtor was individually liable to MDOR for $18,793.53 in tax debt arising out of his

operation of Skip Sergio's, Inc.

21. On or around July 19, 2010, the Debtor and Mrs. Sergio entered into a settlement

agreement with the MDOR pursuant to which they agreed to pay the MDOR $22,000 in full

satisfaction of their prior tax obligations in the amounts of $94,888.11 and $18,793.53.

22. On or around September 2, 2010, the Plymouth Probate and Family Court entered a divorce

judgment for the Debtor and Mrs. Sergio which became final on December 2, 2010.

23. On or around December 28, 2010, Mrs. Sergio refinanced the High Street Property by

obtaining a loan from Quicken Loans in the amount of $204,500.   Of the $204,500 in

proceeds from the loan, $118,039.67 was paid directly to Chase Home Financial, LLC to pay

off the First Mortgage, $28,292.38 was paid directly to Sovereign Bank to pay off the Second

Mortgage, $922 was paid directly to the Town of Bridgewater, $22,000 was paid directly to

the MDOR to satisfy the July 19, 2010 settlement agreement, $16,161.70 was paid directly

to the IRS, $9,480.27 were attributable to closing and settlement costs, and $9,603.89 in

cash went to Mrs. Sergio.  Mrs. Sergio granted Quicken Loans a first priority mortgage on

the High Street Property to secure the $204,500 debt.  The Debtor was not a party to the

loan arrangement, nor was he liable for any obligations under this $204,500 loan.

24. In or around January 2011, the MDOR accepted the $22,000 payment from Mrs. Sergio's

refinancing of the High Street Property in full satisfaction of the outstanding tax debts owed

by the Debtor, Mrs. Sergio, Skip Sergio's, Inc., and Connie's, Inc. totaling $113,681.64.  On or

around January 4, 2011, the MDOR recorded releases of the tax liens listed in paragraphs 6,

11, 12, and 13.

25. In or around January 2011, the IRS accepted the $16,161.70 from Mrs. Sergio's refinance of

the High Street Property in full satisfaction of any outstanding tax debts owed by the Debtor

and Mrs. Sergio.  In or around April 2011, the IRS recorded a release of the tax lien listed

above in paragraph 15.

26. On or around August 3, 2011, Mrs. Sergio sold the High Street Property to unrelated third

party buyers for $285,000.  After paying off encumbrances and closing costs, Mrs. Sergio

received net proceeds from the sale of $62,912.53.  Mrs. Sergio deposited this money into a

bank account.

27. After selling the High Street Property, Mrs. Sergio and her daughter, Mrs. Burke, agreed that

Mrs. Burke would purchase and renovate a house in which Mrs. Sergio, Mrs. Burke, and Mrs.

Burke's family would all reside.

28. On or around December 27, 2011, Mrs. Sergio delivered to her daughter, Mrs. Burke, a

check in the amount of $30,000.  Mrs. Burke used this money to purchase and renovate a

house in Taunton.

29. Eventually, Mrs. Sergio and Mrs. Burke decided that Mrs. Sergio would not move in with

Mrs. Burke and her family.  Mrs. Sergio then asked Mrs. Burke to return the $30,000, but

Mrs. Burke insisted that she had already spent the funds on the house in Taunton.  On

September 10, 2012, Mrs. Sergio commenced an action against Mrs. Burke in Plymouth

County Superior Court to recover the $30,000.  On December 12, 2012, Mrs. Sergio and Mrs.

Burke entered into a settlement agreement pursuant to which Mrs. Burke agreed to pay

Mrs. Sergio $20,000 in monthly installments.  As of the time of the trial in the instant

proceeding, Mrs. Burke had paid Mrs. Sergio approximately $4,900 of this $20,000.

30. On July 2, 2012, the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy

Code, commencing the present bankruptcy case.  The Debtor's Schedule F, which was

admitted as an exhibit, lists unsecured debts totaling $40,437.22.  No evidence was offered

or admitted as to the dates these unsecured debts originated.

IV.      **Jurisdiction and Authority to Enter Final Judgment**

Counts I and II of the Trustee's amended complaint seek avoidance and recovery of an alleged fraudulent transfer under 11 U.S.C. §§ 544 and 550.  Count III seeks turnover of the proceeds of the sale of the High Property pursuant to 11 U.S.C. § 542(a) because they are allegedly property of the bankruptcy estate.  All three counts arise under the Bankruptcy Code and in a bankruptcy case and therefore fall within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  They are all core proceedings.  *See* 28 U.S.C. § 157(b)(2)(E) and (H) (core proceedings include orders to turn over property of the estate and proceedings to determine, avoid, or recover fraudulent conveyances).

Section 157 of title 28 authorizes bankruptcy courts to enter final orders and judgments in core proceedings, subject to appellate review by the district court.  28 U.S.C. § 157(b)(1).  However, the Supreme Court in *Stern v. Marshall* held that even though Congress has statutorily authorized bankruptcy courts to enter final judgment on certain claims, bankruptcy courts may not have the constitutional authority to do so.  *Stern v. Marshall*, 131 S. Ct. 2594, 2620, 180 L. Ed. 2d 475 (2011) ("The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim").  In *Wellness Int'l Network, Ltd v. Sharif*, the Supreme Court held that bankruptcy courts may enter final judgment in so-called *Stern* claims with consent of the parties.  *Wellness Int'l Network, Ltd. v. Sharif*, ⸺ U.S. ⸺, 135 S. Ct. 1932, 1949, 191 L. Ed. 2d 911 (2015) ("The Court holds that Article III permits bankruptcy courts to decide *Stern* claims submitted to them by consent.").  As detailed above, all parties to this proceeding have consented, either orally on the record or in writing, to this Court entering final judgment.  Accordingly, even if any of the counts in this proceeding constitute *Stern* claims, this Court has authority to enter final judgment on all counts.

**V.      Discussion**

**A.   Applicable Law**

Counts I and II of the Trustee's amended complaint seek avoidance of the August 12, 2009

transfer of the Debtor's interest in the High Street Property to Mrs. Sergio pursuant to 11 U.S.C. § 544

and certain sections of MASS. GEN. LAWS ch. 109A, the Massachusetts enactment of the Uniform

Fraudulent Transfer Act.  In relevant part, 11 U.S.C. § 544(b) states that a trustee in bankruptcy "may

avoid any transfer of an interest of the debtor in property [. . .] that is voidable under applicable law by a

creditor holding an unsecured claim that is allowable under section 502 of this title[.]" 11 U.S.C. §

544(b)(1).  It permits a trustee to exercise avoidance rights that belong in the first instance to actual

creditors under applicable law.  In order to exercise this standing, the trustee must show that there

exists an unsecured creditor that itself could bring the avoidance count that the trustee seeks to bring, a

so-called "qualified unsecured creditor."

Applicable law in the case of Count I is MASS. GEN. LAWS ch. 109A, § 5(a)(2)(ii), which provides in

relevant part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
> whether the creditor's claim arose before or after the transfer was made or the
> obligation was incurred, if the debtor made the transfer or incurred the obligation:[. . .]
>
> > (2) without receiving a reasonably equivalent value in exchange for the transfer
> > or obligation, and the debtor:[. . .]
> >
> > (ii) intended to incur, or believed or reasonably should have believed that he
> > would incur, debts beyond his ability to pay as they became due.

MASS. GEN. LAWS ch. 109A, § 5(a)(2)(ii).

Applicable law in the case of Count II is MASS. GEN. LAWS ch. 109A, § 6(a), which provides in

relevant part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor
> whose claim arose before the transfer was made or the obligation was incurred if the
> debtor made the transfer or incurred the obligation without receiving a reasonably

10

equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

MASS. GEN. LAWS ch. 109A, § 6(a).

With respect to both §5 and §6, the Trustee carries the burden of proving each element of by a preponderance of the evidence. *See Lassman v. Reilly, Jr. et al.* (*In re Feeley*), 429 B.R. 56, 62-63 (Bankr.D.Mass. 2010) (citing *Tomsic v. Pitocchelli* (*In re Tri-Star Techs. Co., Inc.*), 260 B.R. 319, 324 (Bankr.D.Mass. 2001). Value given for a transfer "does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." MASS. GEN. LAWS ch. 109A, § 4. The analysis of what constitutes "reasonably equivalent value" under the relevant sections of the Massachusetts Uniform Fraudulent Transfer Act mirrors the analysis of "reasonably equivalent value" under 11 U.S.C. § 548. *See In re Tri-Star Techs. Co. Inc.*, 260 B.R. at 324; *Riley v. Countrywide Home Loans Inc. et al.* (*In re Duplication Mgmt., Inc.*), 501 B.R. 462, 481-84 (Bankr.D.Mass. 2013); *In re Feeley*, 429 B.R. at 63. The analysis of whether a debtor has received reasonably equivalent value in exchange for a transfer under 11 U.S.C. § 548 has been described as follows:

> [C]ourts have uniformly held that a reasonably equivalent value determination should be based on all of the facts and circumstances of the case. The Court should "compare what was given with what was received." And, in making this determination, both direct and indirect benefits should be considered. It is not necessary that there be an exact exchange in order to establish reasonably equivalent value, but the Court "must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed [. . .] will have significantly harmed ... innocent creditors [. . .]"

*In re Tri-Star Techs. Co, Inc.*, 260 B.R. at 325-26 (internal citations omitted).

Both § 5(a)(2)(ii) and § 6(a) get a plaintiff only so far: they establish that certain transfers and obligations are fraudulent as to certain creditors. For remedies as to transfers deemed fraudulent, one must turn to MASS. GEN. LAWS ch. 109A, § 8. In relevant part, it states, "(a) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in section nine, may

11

obtain: (1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's

claim[.]"  MASS. GEN. LAWS ch. 109A, § 8.

Counts I and II also seek recovery of the transferred property interest or the value thereof from

the three defendants under 11 U.S.C. § 550.  Although § 544(b)(1) permits a trustee to rely on

"applicable law"— here the Massachusetts Uniform Fraudulent Transfer Act — to avoid the transfer, the

trustee's right of recovery, upon avoidance of the transfer, is defined by the § 550 of the Bankruptcy

Code itself.  Section 550 provides in relevant part:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided
> under section 544 [. . .] of this title, the trustee may recover, for the benefit of the
> estate, the property transferred, or, if the court so orders, the value of such property,
> from--
>
>> (1)  the initial transferee of such transfer or the entity for whose benefit such
>> transfer was made; or
>
>> (2)  any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550.

Provided the transfer is avoided, the trustee may therefore recover the value of the property in

question.

Finally, Count III seeks turnover of $31,456 of the proceeds from the sale of the High Street

Property plus interest pursuant to 11 U.S.C. § 542(a).  Section 542(a) of the Bankruptcy Code provides as

follows:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian,
> in possession, custody, or control, during the case, of property that the trustee may use,
> sell, or lease under section 363 of this title, or that the debtor may exempt under section
> 522 of this title, shall deliver to the trustee, and account for, such property or the value
> of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542.

The obligation of turnover in § 542(a) applies only to property of the bankruptcy estate.

*Murphy v. Van Patten et al.* (*In re Schofield*), 2014 WL 1477395, at *3 (Bankr.D.Mass. 2014) (citing *In re*

*Belenkova*, 2014 WL 1203131, at *17 (Bankr.D.Mass.2014)).  In relevant part, property of the estate

includes "all legal or equitable interests of the debtor in property as of the commencement of the case,"

11 U.S.C. § 541(a)(1), "[a]ny interest in property that the trustee recovers under section [. . .] 550 [. . .] of

this title," 11 U.S.C. § 541(a)(3), and "[p]roceeds, product, offspring, rents, or profits of or from property

of the estate, except such as are earnings from services performed by an individual debtor after the

commencement of the case," 11 U.S.C. § 541(a)(6).

### B.  Positions of the Parties

The Trustee argues that the August 12, 2009 transfer of the Debtor's interest in the High Street

Property to Mrs. Sergio was constructively fraudulent under either MASS. GEN. LAWS ch. 109A, §

5(a)(2)(ii)) or § 6(a).  As a basis for this argument, the Trustee contends that when the Debtor

transferred his interest in the High Street Property to Mrs. Sergio, he did so without receiving

reasonably equivalent value in exchange for the transfer.  The Trustee contends that, at best, the Debtor

received consideration for the transfer in the amount of $19,080.85 or half of the $38,161.70 settlement

amount eventually paid by Mrs. Sergio to the taxing authorities.  The Trustee asserts that this amount

was not reasonably equivalent to the Debtor's interest in the High Street Property, a contention which

he argues is borne out by the fact that Mrs. Sergio eventually netted $62,912.53 in proceeds from the

sale of the High Street Property after paying off all encumbrances.  The Trustee further contends that at

the time of the transfer the Debtor reasonably should have believed that he would incur debts beyond

his ability to pay as they came due and that he was insolvent.  Accordingly, the Trustee contends that,

exercising the authority afforded to him by 11 U.S.C. § 544(b), he may avoid this constructively

fraudulent transfer under either MASS. GEN. LAWS ch. 109A, § 5(a)(2)(ii) or § 6(a).  The Trustee further

contends that he may recover the value of the Debtor's interest from any of the three named

defendants pursuant to 11 U.S.C. § 550.  Finally, the Trustee argues that he is entitled to turnover of

$31,456 plus interest or one half of the net proceeds Mrs. Sergio received from the sale of the High

Street Property.

The three defendants all contest the Trustee's entitlement to avoid the transfer and to recover

the value of the Debtor's interest.  The defendants contend that the Debtor did receive reasonably

equivalent value in exchange for the transfer.  They argue that the High Street Property was fully

encumbered at the time of the transfer and that the value of the Debtor's interest was, therefore, zero

dollars.  Additionally, the transfer enabled Mrs. Sergio to refinance the High Street Property and then

negotiate and pay off tax debts for which the Debtor was jointly and severally liable totaling

$129,843.34.  Relief from this debt was sufficient consideration for the transfer of the Debtor's interest.

Finally, Mrs. Burke argues that the $30,000 in funds she received from her mother, Mrs. Sergio, are not

identifiable as proceeds from the sale of the High Street Property.

C.  **Analysis**

a.  **Count I – Fraudulent Conveyance Pursuant to 11 U.S.C. Sections 544 and 550 and MASS. GEN. LAWS ch. 109A, § 5(a)(2)(ii)**

The Court must first address the Trustee's authority under § 544(b)(1) to bring this claim.  As

noted above, 11 U.S.C. § 544(b)(1) permits a trustee to exercise avoidance rights that belong in the first

instance to actual creditors under applicable law.  "If there are no creditors against whom the transfer is

voidable under the applicable law, the trustee is powerless to act under section 544(b)." *Indus.*

*Commercial Elec. Inc. v. Babineau* (*In re Indus. Commercial Elec., Inc.*), 2004 WL 1354530, at *5 (Bankr.D.

Mass.2004)(quoting *Le Café Creme, Ltd.*, 244 B.R. at 238 (citing 5 L. King, COLLIER ON BANKRUPTCY, ¶

544.09, at 544–17 (15th ed. rev.1999)).   The applicable law here is MASS. GEN. LAWS ch. 109A, §

5(a)(2)(ii), which may be invoked by creditors whose claims "arose before or after the transfer was

made[.]"  MASS. GEN. LAWS ch. 109A, § 5(a)(2)(ii).  All such creditors – those whose claims existed when

the transfer was made, and those whose claims arose later – are eligible to seek redress under MASS.

GEN. LAWS ch. 109A, § 5(a)(2)(ii).  The Trustee has demonstrated the existence of multiple qualified

unsecured creditors as listed in the Debtor's Schedule F, which was admitted into evidence as a trial

exhibit.  As to the creditors listed on the Debtor's Schedule F, it is unclear whether the creditors' claim

arose before the transfer or after, but it is clear that each claim is in existence and falls into one or the

other of these categories.  Accordingly, the Trustee may proceed under MASS. GEN. LAWS ch. 109A, §

5(a)(2)(ii).

The Court next examines the first prong of MASS. GEN. LAWS ch. 109A, § 5(a)(2)(ii) as applied to

this case: whether the Debtor transferred his interest in the High Street Property to Mrs. Sergio without

receiving reasonably equivalent value in exchange for the transfer.  In doing so, the Court will compare

what the Debtor gave away in the transfer with what the Debtor received in exchange considering both

direct and indirect benefits.  *See In re Tri-Star Techs. Co, Inc.*, 260 B.R. at 325-26.  The Trustee has not

provided any direct evidence of the fair market value of the High Street Property as of the August 12,

2009 transfer date.  However, it has been established that the High Street Property sold for $285,000 on

August 3, 2011 to a third party buyer in an arm's length transaction.  As no evidence of a significant

change in value in the intervening period was presented, the Court finds that the value of the High

Street Property at the time of the transfer was approximately $285,000.  At the time of the transfer, the

High Street Property was encumbered by the First Mortgage, the Second Mortgage, and the tax liens

listed in the above findings of fact at paragraphs 6, 11, 12, 13, and 15.  As of the December 28, 2010

refinancing, the payoff amounts of the First Mortgage and the Second Mortgage were $118,039.67 and

$28,292.38, respectively.  These numbers were even higher on August 12, 2009 before Mrs. Sergio had

been able to reduce the principal with more than a year of additional mortgage payments.  As of August

12, 2009, the tax liens encumbering the High Street Property totaled approximately $129,843.34.[1]  Using

---

[1] The amount of the recorded tax liens encumbering property of the Debtor and Mrs. Sergio as of the transfer date
actually totaled at least $272,172.63, as detailed in the findings of fact above at paragraphs 6, 11, 12, 13, and 15.
However, based on the admitted evidence the total amount of the actual tax debt secured by these liens was at
most $129,843.34.

the $285,000 approximate value of the High Street Property, subtracting the $118,039.67 and

$28,292.38 floors for the First and Second Mortgages, and subtracting $129,843.34 for the approximate

value of the tax liens, we are left with a value of $8,824.61 for the Debtor's and Mrs. Sergio's combined

interest in the High Street Property.  However, if we raise both mortgage payoff amounts to account for

more than a year of principal payments and divide the result in half to account for the Debtor's one-half

interest in the High Street Property, we are left with a value of the Debtor's interest at or near zero.

Accordingly, the value of the Debtor's interest in the High Street Property on the date of the transfer,

*i.e.*, the value of what the Debtor gave away in the transfer, was effectively zero dollars.

In exchange for the transfer of his interest in the fully encumbered High Street Property, the

Debtor received Mrs. Sergio's promise to refinance the High Street Property and to use the proceeds

from the refinance to pay off both Mrs. Sergio's tax debts and the Debtor's tax debts.  This promise to

refinance and pay off the tax debts was not reflected on the deed, was not included in the parties'

written divorce settlement agreement, and was arguably not legally binding.  Accordingly, it was also

worth effectively zero dollars.

Viewing the question of reasonably equivalent value through a narrow lens, the Debtor gave up

an interest worth effectively zero dollars in exchange for a promise also worth effectively zero dollars.

However, the Trustee advocates for a more flexible, big-picture approach to valuing the Debtor's

interest as of the date of the transfer.  Under this approach, even if the High Street Property was fully

encumbered because of the tax liens as of the transfer date, the Debtor's interest at that time was really

greater than zero because the ability of the parties to later negotiate a reduced tax settlement

ultimately freed up equity in which the Debtor should have had an interest.  Thus, the tax liens should

not be viewed as encumbering the High Street Property as of the transfer date, at least not above the

eventual payoff amounts of the tax debts.  While the Court makes no finding that such an approach is

appropriate, the Court will undertake this analysis in order to demonstrate that even under the

Trustee's approach the result does not favor the Trustee.

Applying the Trustee's more flexible approach, again using the $285,000 approximate value of

the High Street Property, again subtracting the $118,039.67 and $28,292.38 floors for the First and

Second Mortgages, and now only subtracting $38,161.70 for the eventual payoff amount of the tax

liens, the value of the combined interests of the Debtor and Mrs. Sergio in the High Street Property as

the transfer date was $100,506.25. Under this approach the value of the Debtor's interest in the High

Street Property as of the transfer date, *i.e.*, the value of what the Debtor gave up was at most

$50,253.16.[2]

Were the Court to adopt such a flexible approach to valuing what the Debtor gave up in the

transfer, it could not do so equitably without applying the same approach to valuing what the Debtor

received. The Debtor's transfer of his interest worth at most $50,253.16 enabled Mrs. Sergio to access a

source of funds needed to negotiate down and pay off tax debts totaling $129,843.34 for which the

Debtor was jointly and severally liable, some of which Mrs. Sergio was not herself liable for at all. The

Court rejects the Trustee's contention that the value received by the Debtor is limited to the eventual

payoff amounts of the tax debts, and the Court rejects the Trustee's argument that this amount should

be divided in half. The Debtor was jointly and severally liable for these tax debts, and he was exclusively

liable for a portion of these debts. Without the transfer and the subsequent refinance by Mrs. Sergio,

the parties would have been unable to negotiate and pay off a settlement, and the Debtor would have

remained on the hook for the full $129,843.34 in tax debt. "[A] determination of whether indirect

benefits suffice as fair consideration turns on whether the debtor's net worth has been preserved and

creditors' interests have not been injured as a result of the transfers." *In re Duplication Mgmt., Inc.*, 501

---

[2] Again, the value would be lower if an adjustment were to be made for any principal paid down by Mrs. Sergio
between the transfer date and the refinance date.

B.R. at 486.  Here, the transfer was the only means by which the Debtor was going to get out from under

$129,843.34 in debts owed to the MDOR and the IRS for which he was jointly and severally liable.  The

Debtor's net worth actually improved when the transfer of his interest in the High Street Property

enabled him to settle debts much greater than the value of said interest.

Viewing the transfer through this wider lens, it is apparent that in exchange for the August 12,

2009 transfer, the Debtor was freed from tax debts that far exceeded the value of his interest in the

High Street Property.  This on its own constitutes more than reasonably equivalent value before even

getting to the possible equitable implications of the facts that Mrs. Sergio originally purchased the High

Street Property herself in 1998 by putting up cash from a past marriage and incurring liability on a

mortgage debt in her name alone, that the Debtor gave effectively no consideration when he received

his interest in the High Street Property in 2000, that Mrs. Sergio used a portion of the proceeds from the

Second Mortgage to pay off an $11,000 car loan in the Debtor's name in 2001 and then invested the

remainder in the Debtor's restaurant, that Mrs. Sergio cured a significant default on the mortgage

without the Debtor's help in 2004 when the couple fell on hard times, and that after 2005 when the

Debtor could no longer work Mrs. Sergio exclusively covered mortgage payments, property tax

obligations, and the cost of upgrades and maintenance.  Under a narrow approach to the question of

value received versus value given, the Debtor received reasonably equivalent value in exchange for the

transfer of his interest in the High Street Property.  Under a flexible, big-picture approach, the Debtor

received much more than reasonably equivalent value.

For the above reasons, the Court finds that the Trustee has not met his burden of establishing

the first prong of MASS. GEN. LAWS ch. 109A, § 5(a)(2)(ii).  The Court does not need to reach the issue of

whether the Trustee has established that the Debtor intended to incur, or believed or reasonably should

have believed that he would incur, debts beyond his ability to pay as they became due when he made

the transfer.  As the Trustee has not met his burden of establishing the elements of MASS. GEN. LAWS ch.

18

109A, § 5(a)(2)(ii), the Trustee is not entitled to avoid the August 12, 2009 transfer of the Debtor's

interest in the High Street Property to Mrs. Sergio under 11 U.S.C. § 544.   Additionally, as the Trustee is

not entitled to avoid the transfer of the Debtor's interest under § 544, he is likewise not entitled to

recover from any of the defendants under 11 U.S.C. § 550.  Liability of a transferee under 11 U.S.C. § 550

is contingent upon the Trustee's ability to avoid the transfer in question.  Accordingly, none of the three

defendants are liable under § 550.

> **b.   Count II – Fraudulent Conveyance Pursuant to 11 U.S.C. Sections 544 and 550 and
> Mass. Gen. Laws ch. 109A, § 6(a)**

The Court must first address the Trustee's authority under § 544(b)(1) to bring this claim.   As

noted above, 11 U.S.C. § 544(b)(1) permits a trustee to exercise avoidance rights that belong in the first

instance to actual creditors under applicable law.  "If there are no creditors against whom the transfer is

voidable under the applicable law, the trustee is powerless to act under section 544(b)."  *In re Indus.*

*Commercial Elec., Inc.*, 2004 WL 1354530, at *5 (internal citations omitted).  The applicable law here is

Mass. Gen. Laws ch. 109A, § 6.  Section 6 may only be invoked by "creditor[s] whose claim[s] arose

before the transfer was made[.]"  Mass. Gen. Laws ch. 109A, § 6.  Therefore, the Trustee must show that

the creditors of the bankruptcy estate include at least one unsecured creditor whose claim was in

existence on the date of the transfer, August 12, 2009.

While the Trustee offered and the Court admitted the Debtor's Schedule F into evidence, no

evidence was offered as to the dates when the unsecured claims listed on Schedule F came into

existence.  Accordingly, there is no evidentiary basis upon which the Court may conclude that any of the

creditors listed on Schedule F held claims that existed prior to the transfer.  The Trustee argues that the

tax obligations described above were in existence at the time of the transfer.  This does not help the

Trustee.  The tax debts have been exonerated, and therefore, neither the IRS nor the MDOR would be

able to bring an avoidance action under Mass. Gen. Laws ch. 109A, § 6.  Moreover, because of the tax

liens, the taxing authorities' claims were not unsecured.  *See* 11 U.S.C. § 544(b) ("[. . .] the trustee may

avoid any transfer of an interest of the debtor in property [. . .] that is voidable under applicable law by a

creditor holding an *unsecured* claim that is allowable under section 502 of this title[.]") (emphasis

added).  Finally, the Trustee contends that, "if [the Debtor] had other personal obligations at the time of

the [transfer of the High Street Property] from the operations of the businesses, as he apparently did,

then [the transfer] deprived these creditors of a means to be paid."  The Trustee does not identify who

these apparent creditors may be, nor is it clear from the Debtor's Schedule F.  "Under § 544(b), the

Trustee bears the burden of proving the existence of a qualified unsecured creditor: a creditor holding

an allowable unsecured claim who could bring the same avoidance action the Trustee is bringing."

*Lassman v. Goldstein* (*In re Goldstein*), 194 B.R. 1, 2-3 (Bankr.D.Mass. 1996) (*internal citations omitted*).

The Trustee has not met his burden of demonstrating the existence of an unsecured creditor who held a

claim against the Debtor as of August 12, 2009 and whose claim remained in existence when the Trustee

brought this action.  As the Trustee has failed to demonstrate the existence of such a qualified

unsecured creditor who could bring an action under Mass. Gen. Laws ch. 109A, § 6, the Trustee lacks

standing to bring Count II.

Alternatively, even if the Trustee had demonstrated the existence of a qualified unsecured

creditor and thus established standing to bring Count II, the Trustee has not established the first prong

of Mass. Gen. Laws ch. 109A, §6, *i.e.*, that the Debtor transferred his interest in the High Street Property

to Mrs. Sergio without receiving a reasonably equivalent value in exchange for the transfer.  As

discussed above, the Court has found that the Debtor did receive reasonably equivalent value in

exchange for the transfer and thus the Trustee has not met his burden of establishing the elements of

Mass. Gen. Laws ch. 109A, §6 by a preponderance of the evidence.  The Court need not reach the second

prong of is Mass. Gen. Laws ch. 109A, §6, whether the Debtor was insolvent at the time of the transfer or

became insolvent as a result of the transfer.  As the Trustee has not established entitlement to avoid the

transfer under applicable law, the Trustee is not entitled to avoid the transfer under 11 U.S.C. § 544(b)

and the Defendants are not liable under 11 U.S.C. § 550.

### c. Count III – Turnover Pursuant to 11 U.S.C. § 542(a)

Count III seeks turnover of $31,456 of the proceeds from the sale of the High Street Property

plus interest pursuant to 11 U.S.C. § 542(a).  The obligation of turnover in § 542(a) applies only to

property of the bankruptcy estate.  *In re Belenkova*, 2014 WL 1203131, at *17.  "The commencement of

a case [. . .] creates an estate[.]"  11 U.S.C. § 541(a).  Such estate includes, "all legal or equitable interest

of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  As of the

commencement of the Debtor's bankruptcy case, the Debtor had no legal or equitable interest in the

High Street Property as the Debtor had transferred his interest in the High Street Property to Mrs. Sergio

on August 12, 2009.  Also, as of the commencement of his bankruptcy case, the Debtor had no interest

in the proceeds from the sale of the High Street Property because he had transferred his interest in the

High Street Property prior to the August 3, 2011 sale.  Accordingly, neither the High Street Property nor

its proceeds are property of the estate under § 541(a)(1).  The bankruptcy estate also includes, "any

interest in property that the trustee recovers under section [. . .] 550[.]" 11 U.S.C. § 541(a)(3).  As

discussed above, the Trustee is entitled to recover neither the High Street Property nor its proceeds

under § 550.  Accordingly, neither the High Street Property nor its proceeds are property of the estate

under § 541(a)(3).  Finally, property of the estate also includes, "[p]roceeds, product, offspring, rents, or

profits of or from property of the estate, except such as are earnings from services performed by an

individual debtor after the commencement of the case."  11 U.S.C. § 541(a)(6).  This section requires

that the proceeds in question derive from an interest that is or was, itself, property of the estate.  As the

High Street Property was never property of the estate, its proceeds cannot be property of the estate

under 11 U.S.C. § 541(a)(6).

As discussed above, the proceeds from the sale of the High Street Property are not property of the estate under § 541(a)(1), (a)(3), or (a)(6), and the Trustee has put forward no other theory under which they may constitute property of the Debtor's bankruptcy estate.  Therefore, as the obligation of turnover in § 542(a) only applies to property of the bankruptcy estate, no party has any obligation to turnover the proceeds to the Trustee.

**VI.    Conclusion**

For the reasons set forth above, the Court will enter a separate judgment declaring that the Trustee's amended complaint against the Debtor, Mrs. Sergio, and Mrs. Burke is dismissed with prejudice.

Date:  June 20, 2016

_____
Frank J. Bailey
United States Bankruptcy Judge